# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ASTELLAS INSTITUTE FOR REGENERATIVE MEDICINE, and STEM CELL & REGENERATIVE MEDICINE INTERNATIONAL, INC., <br><br> Plaintiffs, <br><br> v. <br><br> IMSTEM BIOTECHNOLOGY, INC., XIAOFANG WANG, and REN-HE XU, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. NO. 1:17-cv-12239-ADB

██████████████

**Leave to File Under Seal Granted on
September 24, 2019 (Dkt. 105)**

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

    I.       Factual Background ............................................................................... 1

    II.      Procedural History ............................................................................... 3

LEGAL STANDARDS ....................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

    I.       Plaintiffs Have Not – and Cannot – Demonstrate Diligence ................................. 5

    II.      Defendants Will Be Prejudiced by Plaintiffs' Proposed Additional Claim ............ 9

    III.    Equities Support Denying Plaintiffs' Motion ....................................................... 12

    IV.    Plaintiffs' Proposed Amendment Frustrates Judicial Economy ........................... 13

    V.     Denying Plaintiffs' Motion Would Likely Allow the Court to Conduct a Bench
             Trial ....................................................................................................................... 14

CONCLUSION .................................................................................................................. 14

Defendants ImStem Biotechnology, Inc. ("ImStem"), Ren-He Xu, and Xiaofang Wang (collectively, "Defendants") hereby oppose Plaintiffs' Motion For Leave to File an Amended Complaint.  (Dkt. 96).

## INTRODUCTION

Plaintiffs are attempting to add a breach of contract claim to their Complaint well after the scheduled close of discovery, nearly a year after the deadline for pleading amendments, two years after they filed suit, and more than five years after they knew of the alleged claim – all based on emails they have had for eight years.  Plaintiffs did not need any discovery to understand those emails or any (threadbare) claim they might support.  Plaintiffs' lack of diligence dooms their Motion.  Moreover, if the lack of diligence were not enough to end the inquiry (it is), the Court can and should also deny it on the ground that the amendment would prejudice the Defendants, lengthen the case, and be grossly unfair.

Plaintiffs are simply attempting to add a claim because they have realized – belatedly – that their existing state law claims are time-barred.  That hardly demonstrates "good cause" to add a claim to the Complaint and upend the case.  The Court should deny the Motion.

## BACKGROUND

### I.   Factual Background[1]

This is an inventorship dispute arising from the parties' once-amicable scientific collaboration in the development of protocols for making, and methods of using, mesenchymal stem cells ("MSCs").  *See* Dkt. 1 at ¶ 9.  MSCs are quasi-differentiated cells that have the ability to become a wide range of bodily cells, such as bone, fat, or cartilage.

---

[1]      Given the Court's familiarity with this case as part of its denial of Plaintiffs' motion to dismiss (Dkt. 37) and its recent partial grant of Defendants' motion for leave to file amended counterclaims (Dkt. 85), this factual summary focuses on the issues pertinent to this motion.

In or about 2009, Plaintiff employee Dr. Erin Kimbrel developed a protocol – essentially a recipe – for making a new kind of MSC derived from hemangioblasts ("hemangioblast-derived MSCs" or "HB-MSCs").  *See generally id.* at ¶¶ 3-5.

In July 2010, Drs. Ren-He Xu and Xiaofang Wang met with one of Dr. Kimbrel's colleagues to discuss a potential collaboration concerning the HB-MSCs.  The collaboration began soon thereafter, and the parties began communicating by email and exchanging, among other things, the protocol Dr. Kimbrel developed.  *See, e.g., id.* ¶ 5 ("corresponded directly"); *id.* at ¶ 35.  Drs. Wang and Xu began to modify the protocol.  *See* Dkt. 91 at ¶ 24.  By late 2010, Drs. Wang and Xu's experiments started yielding results.

On November 30, 2011, Dr. Kimbrel and other Plaintiff employees filed a provisional patent application on the technology at issue in the collaboration – without informing or naming Drs. Wang or Xu as co-inventors.  *Id.* ¶¶ 26, 35.  That application matured into the '321 and '956 patents.  On June 27, 2012, Drs. Xu and Wang filed their own patent application on their new version of the HB-MSC protocol, which matured into the '551 patent.[2]

At no point during the parties' collaboration did they execute any formal written agreement regarding confidentiality, use, or ownership of intellectual property.  *See* Dkt. 1 at ¶ 39.

By February 2014, Plaintiffs had become aware of Drs. Wang and Xu's patenting activities – specifically that the Defendants had filed a patent application that allegedly contained some of Plaintiffs' invention(s).  Proposed Amended Compl. (Dkt. 96-2) at ¶ 62 (blackline

---

[2]     During prosecution of the Xu/Wang application, the Examiner concluded that the Xu/Wang modified protocol was entitled to patent protection – despite the existence of Plaintiffs' prior public patent application.  *See* Declaration of Benjamin Stern in Supt. of Defs.' Oppn. to Pltfs. Mot. to Amend Compl. ("Stern Decl."), Ex. 1 at 4-5 (stating that because the claims "now require the presence of a GSK3 inhibitor at a specific concentration . . . [t]his limitation overcomes the rejections of record").

2

comparison).  On June 5, 2014, Matthew Vincent, a former attorney employed by Plaintiffs in a

business development role, noted ████████████████████████████████████████

████████████████████████████████████████.  Ex. 2 at AIRM00097111.[3]  He

nonetheless concluded that ████████████████████████████████████████

████████████████████████████████.[4]

## II.   Procedural History

More than three years later, on November 13, 2017, Plaintiffs filed suit.  (Dkt. 1).  Their

Complaint listed two counts for correction of inventorship, plus five state-law tort claims arising

from the same work and collaboration.  (*Id.*)  Defendants counterclaimed.  (Dkt. 20).  After a

failed attempt by the Plaintiffs to dismiss those counterclaims (Dkt. 37), the parties engaged in

discovery.  On October 29, 2018, the deadline for amending pleadings passed.  (Dkt. 44).

On July 22, 2019, shortly before the scheduled close of discovery, Defendants moved to

amend their counterclaim to, among other things, include a statute of limitations ("SOL")

affirmative defense based on Plaintiffs' internal emails and information they had unearthed

during discovery.  (Dkt. 71-2 at 13; Dkt. 83 at 5-7; *see also* Dkt. 85 at 4).  On July 23, 2019, the

Court held a status conference, during which the parties and the Court discussed Defendants'

proposed SOL defense.  Plaintiffs said nothing about adding a breach of contract claim.  They

likewise said nothing in their 20-page opposition brief.  (Dkt. 79).  On August 21, 2019, the

Court granted the Defendants leave to add a SOL defense.  (Dkt. 85).  On August 27, 2019, the

---

[3]     All Exhibits are attached to the Stern Decl.

[4]     The distinction between SCRMI and Astellas has since disappeared.  "ACT" was Advanced Cell
Technology, Inc., the company that eventually became Plaintiff Astellas Institute for Regenerative Medicine.
SCRMI was a joint venture between ACT and a third party, but was co-located with ACT in Massachusetts.  Dr.
Kimbrel testified at her deposition that she was an employee of SCRMI (and not ACT) until July 2011, when she
became an employee of ACT.  *See* Stern Decl. at Ex. 3 at 68:11-69:7.  Astellas later acquired ACT (and its interest
in SCRMI), and recently acquired the third party's remaining interest in SCRMI.

parties had a meet-and-confer regarding the Court's Order, during which Plaintiffs announced they hoped to add their own SOL defense to Defendants' counterclaims[5] as well as an inventorship claim for a recently allowed-but-not-yet-issued patent application.[6]  Plaintiffs again said nothing about a potential breach of contract claim.

On September 5, 2019, Plaintiffs announced – for the first time – that they wanted to add a breach of contract claim.  *See* Ex. 4.  According to the Plaintiffs, emails on different topics that the parties had exchanged in December 2011, March, 2012, and April, 2012 – *i.e.* emails that the Plaintiffs had sent or received, and had in their possession for six years before the Complaint was filed – had given rise to a contract.  (Br. at 10).[7]  The instant Motion followed.

## LEGAL STANDARDS

Where, as here, a motion to amend is filed after the deadline for such motions in the Scheduling Order, "the liberal default rule is replaced with the more demanding 'good cause' standard of Fed. R. Civ. P. 16(b)."  *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004).  The test "focuses on the diligence (or lack thereof) of the moving party."  *Id*.  "To show good cause, a party must demonstrate 'the deadline in the scheduling order may not reasonably be met, despite the diligence of the [moving] party.'"  *House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co.*, 775 F. Supp. 2d 296, 298 (D. Mass. 2011) (citation omitted).  Motions to amend may be denied, *inter alia*, for reasons of undue delay, the movant's bad faith or dilatory motive, undue prejudice to the opposing party, and futility of the amendment.  *See, e.g., Kader v. Sarepta*

---

[5]     Plaintiffs asked Defendants to agree to allow the addition of a SOL affirmative defense.  Defendants agreed, and Plaintiffs added it in the Amended Answer they filed.  *See* Dkt. 91 at 11 (Third Affirmative Defense).

[6]     The parties have since resolved the latter point via stipulation (Dkt. No. 95).  The Defendants are therefore unclear why Plaintiffs have attempted to reference the allowed-but-not-yet-issued patent application in their proposed Complaint.

[7]     As used herein, "Br." refers to Plaintiffs' Memorandum in Support of Its Motion For Leave to File An Amended Complaint.  (Dkt. 99).

*Therapeutics, Inc.*, No. 1:14-cv-14318-ADB, 2017 WL 72396, at *3 (D. Mass. Jan. 6, 2017), *aff'd*

887 F.3d 48 (1st Cir. 2018).

This Court has emphasized that diligence is the touchstone of the analysis.  In denying

Defendants' earlier attempt to add new grounds for Dr. Xu's counterclaim on the '956 patent, the

Court noted that "indifference by the moving party" may preclude leave to amend, "irrespective

of prejudice" to the non-moving party because "such conduct is incompatible with the showing

of diligence necessary to establish good cause."  (Dkt. 85 at 3) (citing cases).

## ARGUMENT

Eight years after sending and receiving the relevant emails, two years after filing the

Complaint, nearly a year after the deadline for amendment, and well after the scheduled close of

discovery, Plaintiffs' new breach of contract claim is simply too late.  They could have (and thus

should have) brought it when they filed their original Complaint.  Plaintiffs cannot show "good

cause" to overcome their delay and lack of diligence.  This lack of diligence, the prejudice to

Defendants, and the balance of equity all doom Plaintiffs' motion.

## I.    Plaintiffs Have Not – and Cannot – Demonstrate Diligence

Plaintiffs' proposed breach of contract claim appears to be largely predicated on a

December 2011 email thread.[8]  *See* Br. at 10.  According to Plaintiffs, Dr. Kimbrel emailed the

Defendants and told them that they had to keep certain information confidential, and Dr. Xu (but

not Dr. Wang) emailed back words that were allegedly sufficient to create some sort of contract.

---

[8]     It is unclear whether Plaintiffs are claiming that two additional emails from March and April, 2020 are also part of this alleged contract.  The March, 2012 email sent to Dr. Wang was about use of particular data.  (Dkt 96-1). The April, 2012 email was a proposal for joint publication about papers, and said nothing about requiring confidentiality of information.  (Dkt. 96-2).  Although these additional emails are discussed in the background section of the Plaintiffs' brief (Br. at 5), they are not mentioned again, and Plaintiffs' argument as to meeting all of the elements of a breach of contract claim focuses solely on the December, 2011 email.  (*Id*. at 10).  Given Plaintiffs' lack of clarity as to what documents they contend constitute the alleged contract, this Opposition refers to all three emails as the purported basis of Plaintiffs' proposed claim.

*Id.*

This email – and the other two Plaintiffs have identified – have long been in Plaintiffs' files.  Although they cite and attach the "ImStem" versions of these emails, Plaintiffs have had their own corresponding copies of the same emails in their system since 2011 and have already produced them in this litigation.  *Compare* Sharkey Decl. (Dkt. 96), Ex. 1, *with* Stern Decl. Ex. 5 at AIRM00014908; Sharkey Decl., Ex. 2, *with* Stern Decl. Ex. 6 at AIRM00016868; Sharkey Decl., Ex. 3, *with* Stern Decl., Ex. 7 at AIRM00016190.

Moreover, Plaintiffs knew about the emails the day they filed suit.  They admit they referenced the emails in the Complaint.  (Br. at 8) ("[T]he underlying communications giving rise to the contract claims were part of Astellas' original complaint."); *see, also e.g.*, Dkt. 1 at ¶ 37 ("… [Dr. Kimbrel] *wrote to Dr. Wang* that he could not distribute her slides … to anyone else … Dr. Wang agreed….") (emphasis added); *id.* at ¶ 42 ("Dr. Kimbrel sought confirmation *in writing* that Drs. Xu and Wang understood that [Plaintiffs] owned and controlled the intellectual property .... Dr. Xu agreed to this understanding.") (emphasis added).

Plaintiffs also have long known about Defendants' alleged breach of the supposed agreement since at least February 4, 2014, ████████████████████████████████████ ██.  *See, e.g.*, Dkt. 96-2 at ¶ 62 (blackline comparison); ████████████████████████.

In short, the day they filed suit in November 2017, the Plaintiffs could have brought a breach of contract claim based on the emails and arguments raised now for the first time, almost two years into the case.  This is undue delay.  *See, e.g., Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 327 (1st Cir. 2008) (affirming denial of motion to amend for undue delay because the proposed amendment was entirely "based on information that [the movant] had or should have had from the outset of the case"); *see also Nikitine v. Wilmington Tr.*

6

*Co.*, No. 11-1231(JAG), 2012 12896162, at *2 (D.P.R. May 14, 2012), *aff'd* 715 F.2d 388 (1st Cir. 2003) (denying motion to amend because a party "should not be kept on the hook while counsel adjusts the [pleading] for previous failings, thereby gaining additional and unwarranted swings at the mound").

By way of justification, Plaintiffs contend that they only realized their mistake after the Court allowed Defendants to add a SOL defense. *See* Br. at 8 ("diligently reanalyzed the evidence to identify an action with a longer limitations period"). Even if true, Plaintiffs' excuse collapses upon itself. Defenses do not give rise to new grievances. A plaintiff's claims exist at the time of filing (or not) regardless of the defendants' defenses. Here, the Plaintiffs and their lawyers should have understood their claims – as well as and any potential defenses that could vitiate those claims – at the time they filed the Complaint. *See* Fed. R. Civ. P. 11. Either they failed to do so, or they made a tactical decision to wait.[9]   Neither amounts to good cause.

As the First Circuit recently stated in upholding a denial of a motion for leave to amend, "the district court reasonably could have concluded that [the movant] was scrambling to devise new theories of liability based on the same facts plead in her original complaint – theories that could and should have been put forward in a more timeous fashion." *Mulder v. Kohl's Department Stores, Inc.*, 865 F.3d 17, 21 (1st Cir. 2017);[10] *cf. DiVenuti v. Reardon*, 37 Mass. App. Ct. 73, 77 (1994) ("Among the good reasons, however, for which a motion to amend may be denied are that no justification for the lateness of the motion is apparent (beyond counsel for the moving party having a late dawning idea) …."). The same is true here.

---

[9]     Put differently, the Plaintiffs either knew or should have known at the time they filed suit that the ▮▮▮ (and many others) barred their late state-law claims.

[10]     In *Mulder*, the movant admitted that the motion for leave to amend was filed in an attempt to rectify deficiencies that the court had recently identified in her other claims. *Id.* The same is true here; Plaintiffs admit they are seeking to add a breach of contract claim to get around Defendants' SOL defense. (Br. at 8).

Plaintiffs' statement that they had "*no cause* to seek to add a separate breach of contract claim" earlier is likewise nothing more than a confession of lack of diligence.  (Br. at 8) (emphasis added).  By implication, Plaintiffs were aware that they *could* have sought to add a separate breach of contract claim "earlier in the case," but they simply made the affirmative and tactical decision not to do so.

Such unexplained, unexcused, and undue delay is enough to deny Plaintiffs' motion.  *See, e.g., Pearlmutter v. Shatzer*, 102 F.R.D. 245, 246-49 (D. Mass. 1984) (finding undue delay because movant "had notice since the outset of the litigation" and that the delay in seeking to amend claim "had significantly prejudiced the [non-moving party]"); Dkt. 85 at 5 (discussing same); *Kader*, 887 F.3d at 60-61 (stating that "undue delay, even standing alone, can provide a court to provide adequate grounds to deny leave," and "we have explicitly condemned a 'wait and see' pleading, whereby plaintiffs "having the needed information, deliberately wait in the wings …"); *Calderón-Serra v. Wilmington Trust Co.*, 715 F.3d 14, 20 (1st Cir. 2013) ("Appreciable delay alone, in the absence of good reason for it, is enough to justify denying a motion for leave to amend."); *see also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008) ("It is black-letter law that "[r]egardless of the context, the longer a plaintiff delays, the more likely [a] motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend.").[11]

Plaintiffs next try to argue that they needed deposition testimony in order to understand the grounds for their claim.  (Br. at 7-9).  This argument fails.  Dr. Xu was simply asked a

---

[11]     Plaintiffs' citation to *McGowen v. Four Directions Dev. Corp.*, No. 1:12-CV-00109-JAW, 2013 WL 2455977, at * 5 (D. Me. June 6, 2011). (Br. at 6) is inappropriate.  In *McGowen*, the moving party was seeking to drop a claim, rather than (as is the case here) to add one.

leading question about the December 2011 email thread (and nothing about any confidentiality or use restrictions in the other two emails). *See* Br. at 8-9; *see also* Sharkey Decl., Ex. 7 at 115:6-117:19. His testimony added nothing of substance.[12] Dr. Wang's testimony is even farther afield. Dr. Wang was not shown, or asked about, any of the three emails – including the exchange he had with Dr. Kimbrel in March, 2011.[13] *See generally* Sharkey Decl., Ex. 8. Finally, Plaintiffs' suggestion that Defendants needed to depose Plaintiffs' employees in order for Plaintiffs to understand they could bring a contract claim (Br. at 9) strains credulity.[14]

Plaintiffs' lack of diligence is even more striking when considered against Defendants' rationale as to why they should have been allowed to add a claim for Dr. Xu to be an inventor of the '956 patent (they did not understand the scope and breadth of Dr. Xu's claims until he came to the United States in advance of his July 3, 2019 deposition). (Dkt. 85 at 10-11). The Court rejected Defendants' proffered reason. (*Id.*) Plaintiffs' greater lack of diligence regarding their proposed breach of contact claim should likewise doom their request.

## II.    Defendants Will Be Prejudiced by Plaintiffs' Proposed Additional Claim

Contrary to Plaintiffs' assurances (Br. at 9), a new breach of contract claim would, in fact, disrupt the schedule (Dkt. 106) and prejudice Defendants.

First, Defendants would need to take supplemental depositions of Dr. Kimbrel, Dr.

---

[12]    Plaintiffs' reliance *Gouin v. Nolan Assoc., LLC*, 325 F.R.D. 521, 523 (D. Mass. 2017) misses the mark. (Br. at 8). In that case, the defendant needed to take discovery to confirm that the plaintiff actually had a "ticket" in her possession. *Id.* Here, in contrast, Plaintiffs cannot seriously argue that they needed discovery to know Drs. Xu and Wang received Dr. Kimbrel's emails. Putting this aside – and ignoring that Plaintiffs claimed in their original complaint that this email provided notice of limitations on use and confidentiality – an understanding of what was subjectively in Dr. Xu's mind at the time he received the email is not necessary to bring a breach of contract claim.

[13]    Rather, Dr. Wang was asked about a "confidential protocol" that Dr. Kimbrel shared with him in August 2010, which is well before the purported agreement in 2011-2012. *See* Sharkey Decl., Ex. 8 at 96:7-98:10; *see also id.* at 100:33-101:12 (Dr. Wang testifying that "[c]onfidential is their statement, and there are things that's public, available information, and they cannot mark a [sic] confidential on everything staying that this is confidential.").

[14]    Plaintiffs also contend that they needed to "consider admissions that Defendants made" in the prior briefing on the SOL defense. (Br. at 7). Yet they have not identified a single admission, nor have they explained how such alleged admissions somehow gave them previously unknown grounds to assert a breach of contract claim.

Robert Lanza, and Dr. John Lu (former employee, now a third party) to ask them about a raft of issues.  None of these deponents were shown or asked about any of the three emails.  In addition to asking about the emails, Defendants would need to inquire of the witnesses on at least the following issues:

- Plaintiffs' understanding and practice regarding confidentiality or use restrictions prior to each of the three emails that Plaintiffs have identified, including during the beginning of the collaboration in 2010;

- the nature and circumstances surrounding materials that Plaintiffs provided to Defendants in 2010, before any of the three emails were sent;

- parol and extrinsic evidence relating to the alleged agreement;

- the reason(s) why formal, written agreements were never entered into between the parties;

- internal discussions and communications among Plaintiffs' employees about Dr. Kimbrel's December 2011 email in which, for the first time, she discussed confidentiality and use;

- the import (or not) to them of Dr. Wang's lack of response at the time and whether there were any internal discussions among Plaintiffs' employees about that;

- the differences and similarities between the practices of SCRMI and ACT with respect to confidentiality, written agreements, and limitations on use;

- differing views between Drs. Lanza, Lu, and Kimbrel about whether all of the information exchanged was, in fact, confidential;

- other, similar interactions with third parties to determine whether what happened here (no written agreement) was consistent (or inconsistent) with other collaborations;

- Plaintiffs' own breaches of the purported agreement; *see, e.g.,* Ex. 8 at 117:21-118:12, 126:10-132:7) (additional testimony not cited by Plaintiffs regarding the December 2011 and April 2012 emails); and

- facts relating to, supporting, or contradicting Plaintiffs' alleged damages flowing from the purported breach of contract that may be different from, or in addition to, their claimed damages for the existing state law tort claims.

10

None of these topics were covered in the prior depositions, and certainly not with the lens that there was some sort of a binding contract between the parties.[15]  And, although they downplay it in their brief (for obvious reasons), if Defendants are allowed to take additional discovery, Plaintiffs would likely wish to retake the deposition of Dr. Xu and/or Dr. Wang.[16]

Second, Defendants would need to take the deposition of Mr. Vincent, who was not previously deposed.  Mr. Vincent is a third party and is no longer employed by the Plaintiffs.  In addition to the aforementioned topics, Defendants would want to question him about any and all advice he gave Plaintiffs about ███████████████████████████.  *See, e.g.,* Ex. 2, at AIRM00097111 (email from Mr. Vincent ████████████████████████████ ██████████.  Given his position at ACT, his training as an attorney, and his substantial experience with intellectual property matters, Mr. Vincent's statement ███████ ████████████████████████████████████ is important evidence that Defendants are entitled to explore.

Third, Defendants would need time to develop facts to support additional affirmative defenses that could bar Plaintiffs' proposed claim.  For example, given the nature of the agreement (emails), there may have been mutual or unilateral mistake; the statute of frauds likely defeats Plaintiffs' proposed claim; the lack of definite terms may doom its enforcement; and the parties' prior course of conduct may limit or prevent enforcement of any contract.

The foregoing simply cannot fit into the schedule for the remainder of the case.[17]  *See*

---

[15]     Defendants would need to propound interrogatories directed toward all of the aforementioned issues, as well as seek the identification and production of additional documents, testimony, or other information that Plaintiffs believe support their claim.

[16]     To the extent Plaintiffs seek it later, Defendants will object to any subsequent deposition of Dr. Wang and/or Dr. Xu.  Such a dispute would likely result in motion practice.

[17]     The Court's Amended Scheduling Order set opening expert reports due on October, 4, 2019, rebuttal expert reports due on November 1, 2019, expert discovery be completed by December 4, 2019, summary judgment briefing run from December 19, 2019 to (potentially) January 17, 2020, significant pretrial deadlines in February and March,

Dkt. 106 ("[n]o further extensions [of fact discovery] will be granted"); *EMC Corp. v. Pure Storage, Inc.*, 310 F.R.D. 194, 202 (D. Mass. 2015) (finding prejudice where allowance of the new claims would require extending the pretrial deadlines, increase costs, and cause substantial delays in resolving the dispute). At present, the parties are deeply engaged in preparing expert reports (due on October 4, 2019) and, in October, will be responding to several expert reports (due on November 1, 2019).[18] (Dkt. 106). November and the beginning of December are slated to be for expert depositions (to end by December 4, 2019), which will require substantial time and attention. (*Id.*) Then, approximately two weeks later, on December, 19, 2019, summary judgment motions are due. (*Id.*) The remainder of the significant pretrial deadlines follow shortly thereafter, with trial starting on April 27, 2020. (*Id.*) Putting aside that taking discovery after summary judgment briefing prejudices Defendants,[19] even if the Court were to entertain it, the entire case schedule would need to be substantially extended. (Dkt. 106).

## III.   Equities Support Denying Plaintiffs' Motion

Lacking helpful case law or facts, Plaintiffs reach for "equity." (Br. at 8). The effort fails. *Cf.* Dkt. 85 at 3 (reciting legal standard); *U.S. ex rel. D'Agostino v. EV3, Inc.*, 802 F.3d 188, 194 (1st Cir. 2015) ("[b]asic notions of due process counsel that litigants are entitled to rely on established procedural rules—and those rules cannot be altered at a court's whim"). Plaintiffs had the three emails in their possession and could have (and should have) known about the import of such emails when they filed their Complaint. Even crediting Plaintiffs' excuse that

---

2020, and a trial commencing on April 27, 2020. (Dkt 106).

[18]    Pursuant to the Protective Order, at present Plaintiffs have disclosed three experts and the Defendants have disclosed two.

[19]    Defendants would want to have completed the aforementioned additional discovery well in advance of the summary judgment deadline so that they could include it affirmatively in an opening brief, or defensively in opposition to a motion from Plaintiffs.

they could not have foreseen that their state law claims were time-barred, it is telling that they were silent as to any new claim during the July 23, 2019 status conference, during the subsequent briefing,[20] and during the parties' August 27th meet and confer in response to the Court's allowance of Defendants' motion to amend.  It is only now, in the midst of the parties preparing expert reports, and on the precipice of a tight case schedule, that they raise this "new" claim.

Nor does the parties' respective resources counsel a new claim.  As Defendants have previously explained, Plaintiffs have devoted more lawyers to this case than ImStem has employees.  The case has already been burdensome; another claim and a longer case will only add to the burden.

## IV.   Plaintiffs' Proposed Amendment Frustrates Judicial Economy

Although Plaintiffs are correct that judicial economy can be a consideration when deciding whether to allow their motion to amend, it is unclear how adding a new claim and extending this case would aid judicial economy.  Moreover, the consideration of judicial economy should not trump:  (1) Plaintiffs' failure to establish diligence; (2) substantial prejudice to the Defendants; and (3) the balance of equities.  *See, e.g., EMC*, 310 F.R.D. at 202.  If the Court were to allow Plaintiffs' new breach of contract claim, the Court would have to reopen fact discovery, deadlines would have to be extended, and an April 2020 jury trial date would be impossible.  A new claim would also complicate summary judgment briefing, as the parties would have to brief (and the Court would have to consider) whether the three emails constitute a binding contract.[21]

---

[20]    Even though they did not raise their proposed breach of contract claim during such briefing, they attached (and discussed) emails that they claim that they only "diligently reanalyzed" once the Defendants' SOL defense was allowed.  *Compare* Dkt. 76-4 *with* Sharkey Decl. Ex. 1; Dkt. 76-5 *with* Sharkey Decl. Ex. 3; *see also* Dkt. 75 at 4-5.

[21]    Plaintiffs assert that email is sufficient to establish a contract and cite the *Shattuck* case from the Massachusetts Superior Court as support.  (Br. at 10).  A subsequent decision, which was affirmed on appeal, distinguished *Shattuck* and held that the emails at issue did not rise to the level of a contract.  *See Singer v.*

## V.        Denying Plaintiffs' Motion Would Likely Allow the Court to Conduct a Bench Trial

There is a reason why Plaintiffs are fighting so desperately to add a claim after the close

of discovery, predicated on facts known for years before they filed the Complaint.  It is the same

reason they fought so hard to keep Defendants' SOL defense out of the case in the first place,

even going so far as to oppose a reply brief.  (Dkt. 79).  Plaintiffs want a jury trial – presumably

to force a small, Chinese-national-led startup in front of a jury – but are not entitled to one.  As

Defendants informed the Court during the July 23, 2019 status conference, and in their reply

brief on their motion for leave to file amended counterclaims, all of Plaintiffs' currently-pleaded

jury-triable claims are barred by the statute of limitations.  (Dkt. 83 at 6-7 (discussing some of

the record evidence)).  Plaintiffs have now admitted all the relevant facts that would bar such

claims.  (Dkt. 96-2 at ¶ 62 (admitting knowledge by February 4, 2014)).[22]  Thus, the jury triable

claims will disappear.

Once these state law claims fall away from the case, a bench trial would allow the parties

flexibility in scheduling additional discovery, streamline the issues and testimony, and, result in a

substantially shorter trial (because there would be fewer claims and narrower issues to try).[23]

### CONCLUSION

As Plaintiffs admit, they have long known about the facts underling their proposed new

breach-of-contract claim.  Plaintiffs have not offered any justification or excuse why – despite

---

*Adamson*, No. 292128, 2003 WL 23641985, at *5-*6 (Mass. Land Ct. Dec. 24, 2003), *aff'd by* 65 Mass. App. Ct. 1103, 837 N.E.2d 313 (2005).

[22]        Defendants intend to move for summary judgment on SOL and return the case to what it always should have been in the first place – a clean inventorship fight over the three patents at issue.  Such claims sound purely in equity and there is no entitlement to a jury.

[23]        For example, both parties have identified damages experts, who will (presumably) testify about the financial harm suffered.  Once the state law claims disappear from the case, however, the possibility of money damages (and the complications that would bring to trial) would vanish.  Another example is that the scope of the evidence would be limited to inventorship issues.

several opportunities – they are only now raising this "new" claim.  Their lack of diligence should end the inquiry.  Further, allowing Plaintiffs' motion would prejudice Defendants as it would require substantial additional discovery.  In light of all of this, and because Plaintiffs displayed "apparent indifference" to identifying and bringing their new proposed claim now, they cannot meet the necessary "good cause" standard.

**WHEREFORE**, for the aforementioned reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion to File an Amended Counterclaim.

Dated:  September 27, 2019                     Respectfully submitted,

IMSTEM BIOTECHNOLOGY, INC., REN-HE XU and XIAOFANG WANG,

By their Attorneys,

/s/ *Benjamin M. Stern*
Timothy R. Shannon, MA Bar # 655325
VERRILL DANA LLP
One Portland Square
Portland, Maine 04101-4054
(207) 774-4000
tshannon@verrill-law.com

Benjamin M. Stern, MA Bar # 646778
VERRILL DANA LLP
One Federal Street
Boston, Massachusetts 02110
(617) 309-2600
bstern@verrill-law.com

## CERTIFICATE OF SERVICE

I hereby certify I caused an <u>unredacted copy</u> of this document to be sent to counsel for Plaintiffs on the date below.  A <u>redacted copy</u> of this document will be filed in accordance with the Court's procedures for filing such through the CM/ECF system, to be sent electronically to the registered participants, and paper copies to be sent to those indicated as nonregistered participants.

Dated:  September 27, 2019                     /s/ *Benjamin M. Stern*
                                             Benjamin M. Stern