1            UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS

3    _____

4    ASTELLAS INSTITUTE FOR
     REGENERATIVE MEDICINE,
5
                    Plaintiff,          Civil Action
6                                       No. 17-CV-12239-ADB
     v.
7                                       August 12, 2020
     IMSTEM BIOTECHNOLOGY, INC.,
8    et al.

9                    Defendants.        Pages 1 to 38
10   _____

11

12        TRANSCRIPT OF HEARING VIA ZOOM VIDEOCONFERENCE
            BEFORE THE HONORABLE ALLISON D. BURROUGHS
13                 UNITED STATES DISTRICT COURT

14

15

16

17

18

19

20

21

22                JOAN M. DALY, RMR, CRR
                   Official Court Reporter
23            John J. Moakley U.S. Courthouse
             One Courthouse Way, Room 5507
24                  Boston, MA  02210
                  joanmdaly62@gmail.com
25

1    APPEARANCES:

2

     FOR THE PLAINTIFF:

3

4            **DAVID P. FRAZIER, ESQUIRE**
             **MICHAEL A. MORIN, ESQUIRE**
5            **REBECCA L. RABENSTEIN, ESQURIE**
             Latham & Watkins LLP (DC)
6            555 11th Street, N.W.
             Suite 1000
7            Washington, DC 20004-1304
             202-637-2259
8            david.frazier@lw.com
             michael.morin@lw.com
9            rebecca.rabenstein@lw.com

10           **YI SUN, ESQUIRE**
             Latham & Watkins LLP
11           12670 High Bluff Drive
             San Diego, CA 92130
12           (858) 523-5415
             yi.sun@lw.com

13

14

     FOR THE DEFENDANTS:

15

16           **MARTHA C. GAYTHWAITE, ESQUIRE**
             **TIMOTHY R. SHANNON, ESQUIRE**
             Verrill Dana, LLP
17           One Portland Square
             P.O. Box 586
18           Portland, ME 04112-0586
             207-774-4000
19           mgaythwaite@verrilldana.com
             tshannon@verrilldana.com

20

21           **BENJAMIN M. STERN, ESQUIRE**
             **TRAVIS K. WALLER, ESQUIRE**
22           Verrill Dana, LLP
             One Federal Street, 20th Flr.
23           Boston, MA 02110
             617-309-2600
24           bstern@verrill-law.com
             twaller@verrill-law.com

25

1              P R O C E E D I N G S

2              (The following proceedings were held via Zoom

3    videoconference before the Honorable Allison D. Burroughs,

4    United States District Judge, United States District Court,

5    District of Massachusetts, on August 12, 2020.)

6              THE CLERK:  This is civil action 17-12239.

7    Astellas versus ImStem Biotechnology.  Will counsel identify

8    themselves for the record.

9              MR. FRAZIER:  This is David Frazier from Latham &

10   Watkins for the Astellas plaintiffs.  I'm joined today by my

11   partner Mike Morin.  Also I have Reba Rabenstein and Yi Sun

12   also from Latham.  We have our client representative Andrea

13   Tiglio, and she's an associate general counsel for Astellas.

14             MR. SHANNON:  Good morning, Your Honor.  Tim

15   Shannon of Verrill Dana for defendants.  I'm joined here

16   today by my colleagues, Martha Gaythwaite, Ben Stern and an

17   associate who has not yet appeared in the case but is

18   observing today, Travis Waller.

19             THE COURT:  We are scheduled today for a final

20   pretrial conference, but there's a motion pending keeping the

21   evidence open indefinitely.  So I'd like to start with that

22   because that will obviously impact whether or not we need to

23   have the final pretrial.  I am not prepared to leave the

24   evidence open indefinitely.  I understand the problem and the

25   challenges of COVID, but I just don't think it's fair to

1    leave the evidence open in a way that let's people have so

2    much time to figure out what happens next.  So given that I'm

3    not willing to leave it open indefinitely, where does that

4    leave us?

5              MR. FRAZIER:  Well, Your Honor, this is David

6    Frazier for Astellas.  I think that the issue is that an

7    indefinitely delay then -- if the alternative is an

8    indefinitely delay, then that leads us to the same place,

9    that it's just something we can't go that far.  I think the

10   cases that are cited in the memoranda are in accord with

11   that.

12             There have been certainly situations, witnesses get

13   sick.  You know, if there's a foreseeable end to the illness,

14   that's one thing.  But really I think the main point here is

15   that this is not really so much a COVID issue as much as it

16   is an international relations immigration issue.  As I

17   understand it, the problem is that if these witnesses leave

18   their jurisdiction in order to go someplace where they can

19   testify remotely, they won't be able to return.

20             I don't think we can sit by and wait for

21   international relations between the United States and China

22   to improve to a point where they would be able to return to

23   their location.  So that's our primary concern.

24             The other point is, without pointing a lot of

25   fingers, this is the type of thing that is perfectly

1    foreseeable.  It's something that from the start we've known

2    these witnesses live halfway around the world, that they live

3    in China where the rules may be different.  And so the point

4    is that this is something that is foreseen by the federal

5    rules.  Witnesses become unavailable.

6            They've both been deposed extensively.  We can have

7    a fair trial without them.  Their testimony is largely

8    overlapping with the testimony of witnesses who will be

9    available live.  So I really do think that we can proceed and

10   have a full and fair trial and get the full statements from

11   these witnesses with the record that's been developed.

12           Just finally, along those lines, I just point out

13   that in their motion, ImStem never makes a specific proffer

14   of what exactly it is that these individuals are going to say

15   that was not included in the depositions or is not going to

16   be covered by Dr. Wong.  And I think absent that kind of a

17   showing, it's particularly inappropriate to continue the

18   trial indefinitely merely on the basis of a generalization

19   that it wouldn't be fair for them to proceed just on the

20   depositions.

21           THE COURT:  I'm happy to make that kind of proffer.

22   What I'm disinclined to do is have just an open-ended

23   continuance.  If you told me that someone was having cancer

24   treatment or something for a month or whatever, I would hold

25   it open.  The scenario that's been outlined is years.  I'm

 1   just not prepared to do that.  I am open to alternatives.

 2   I'm happy to require them to make a proffer.  Mr. Shannon,

 3   where are you?  What's your view on this?

 4            I don't see him on mute, but I can't hear him

 5   either.  Karen, is he muted?

 6            THE CLERK:  I don't think so.

 7            THE COURT:  Does someone else want to speak for the

 8   defendant?

 9            MS. GAYTHWAITE:  Your Honor, this is Martha

10   Gaythwaite, in terms of while Mr. Shannon's technological

11   problems are being solved, we're not really asking for an

12   open-ended continuance.  We recognize the Court's concerns

13   and plaintiff's concerns.  What we would request, Your Honor,

14   is if we could begin the trial and revisit the issue in the

15   middle of September.  We may have a better definition in

16   terms of both the COVID situation and the travel restrictions

17   that are imposed because of the COVID.

18            So again, Your Honor, we recognize the issues.  We

19   are prepared to go forward with the trial.  In terms of what

20   we're talking about is Dr. Xu is an actual party in this

21   case.  He is the inventor.  It's his genius, frankly, that

22   brought about this discovery and this invention.  And it

23   would be fundamentally unfair from our view not to allow him

24   to explain how he came out with this process and how he ended

25   up coming up with the technology for the patent.

1          Again he was deposed, but he was subject to

2     questions by plaintiff's counsel, Attorney Shannon and

3     Attorney Stern didn't have an opportunity to ask him the

4     questions that they planned to ask him on direct in terms of

5     the genesis of the idea, how he went about his work.  And

6     again he's a named party, Your Honor.  So we're not looking

7     for an open-ended continuance, but we would ask the Court's

8     indulgence to revisit this in mid September.

9          THE COURT:  I read the briefs, and I understand

10     that there might not be subpoena authority, that it will be

11     difficult to compel someone from another country to testify

12     depending on the rules.  He can't lock himself in his bedroom

13     and be on the screen with us?

14          MS. GAYTHWAITE:  Apparently, Your Honor, Chinese

15     law forbids that and Macao law forbids that.  Otherwise that

16     would have been what would happen.  The only reason he would

17     need to travel to Hong Kong or Viet Nam or someplace else is

18     simply because we don't want to have our client violate the

19     law.

20          THE COURT:  Your proposal is that we start the

21     trial and revisit it in the middle?

22          MS. GAYTHWAITE:  Yes, Your Honor.  We are not

23     asking for a continuance of the trial recognizing that

24     everybody has worked very hard to reserve this time.  So

25     we're prepared to go forward.  But we do think that we have

1  critical witnesses in Dr. Men and Dr. Xu.

2          THE COURT:  If we get mid trial and then you tell

3  me that they're not going to be available for another year, I

4  am not going to hold the evidence open.

5          MR. SHANNON:  Is my audio working?

6          THE COURT:  Now we can hear you but very faintly.

7          MR. SHANNON:  I'm going to try my headset.  Can you

8  hear me now?

9          THE COURT:  It's still faint.  Do you have a volume

10  control you can turn up?  I'm wondering if that is the issue.

11          MR. SHANNON:  I'll turn it up as high as I can.

12  How is that?

13          THE COURT:  It's better.

14          MR. SHANNON:  If I could just add to what Attorney

15  Gaythwaite argued on our behalf.  Your Honor, may I?

16          THE COURT:  Sure.

17          MR. SHANNON:  As a starting point, Astellas has not

18  contested that Dr. Xu and Dr. Men cannot come full stop.

19  They were banned in April.  They were banned in June, and

20  they are banned now.  That's been true all along.  The fact

21  that we've discovered it now doesn't change the fact that

22  they were not available and are not available.

23          We've been trying very hard to move this case

24  along.  We've tried to make accommodations.  It was

25  originally their suggestion that Dr. Xu and Dr. Men appear by

1    video.  In an effort to keep the case going, we agreed to

2    that.  When we found out a week before our June conference

3    that they were going to go for a bench trial, we relented.

4    There are still plenty of impediments and shortcomings

5    arising from video, particularly where our witnesses are

6    twelve time zones away, but we agreed to it in an effort to

7    keep the case moving.

8           We are very interested in keeping the case moving.

9    At the same time, at the same time, Dr. Xu is a named

10   defendant.  His property rights are at risk both defensively

11   and offensively.  His financial stake is at risk.  And I

12   don't credit Astellas' contention that he's not an important

13   witness because they deposed him twice.  That's an important

14   witness.

15          He is the senior scientist, the head of the Stem

16   Cell Institute at the University of Connecticut, Dr. Wong's

17   supervisor, the originator of many ideas and a coordinator on

18   all of them.  It's his rights that are at stake.  We

19   understand the Court's reluctance to keep this case open

20   forever.  But again, I would have to dispute something that

21   counsel said.

22          This is very much a coronavirus issue.  It's the

23   COVID issue.  We're not replying on political whims of Hong

24   Kong, for example, if that's what he's alluding to.  There

25   are plenty of countries that our clients could get to to

1    testify.  Unfortunately China and Macao are not among them.

2    We've looked at Viet Nam, Thailand, Mongolia, Philippines.

3    There are options.  They just need to get back into China,

4    and that is a function of coronavirus.  Not politics with the

5    United States, just the coronavirus.  That's a three-six

6    month problem, not a two-year problem.

7         While we are prepared to start with the trial, and

8    I understand the Court's position that the Court does not

9    want it keep the case open forever, we are asking for some

10   leeway to try to find the earliest opportunity to have

11   Dr. Xu, in particular, less so Dr. Men.  He's a lesser

12   concern.  I think both sides would agree.  For a trial to

13   proceed without a named defendant in the midst of a global

14   pandemic we think would be unfair.

15        I'm sorry if I sound like I'm shouting.  I

16   apologize for that.

17        THE COURT:  You're fine.  Not to worry.  I'm

18   willing to hold the trial on the dates that we've held aside,

19   and I'm willing to continue the trial.  But what I'm not

20   willing to do is hold the trial, and where it's expected to

21   be a bench decision -- I want to make a decision while the

22   evidence is relatively fresh in my mind and in my law Clerk's

23   mind.  And I'm not going to put it off indefinitely.

24        I'm willing to revisit it in September in the

25   middle of the trial if that's what you want to do but

1    understanding I am not going to put it off indefinitely.  I

2    don't think it's fair to me.  I don't think it's fair to my

3    law clerk.  I also don't think it's fair to the parties to

4    expect me to listen to a trial and make a billion other

5    decisions and then come back to this one.  I am not willing

6    to put myself or my staff in that position.  I'm just not.

7            MR. SHANNON:  Your Honor, may I follow up in

8    response to that?

9            THE COURT:  Yes.

10           MR. SHANNON:  We understand completely, and that is

11   a perfectly reasonable, legitimate judicial consideration.  I

12   would like the opportunity, if I may, I think it makes sense

13   for perhaps for us to continue, as Attorney Gaythwaite just

14   suggested, that we continue the pretrial conference today.  I

15   would like to reserve conferring with my client because

16   Dr. Xu would be -- his absence would not only affect the

17   group as a whole, but I want to make sure he's comfortable

18   with the notion of the trial going forward without him, if

19   that is a possibility.

20           So I think as a practical matter, we should

21   continue with the conference today, but I'd like, for

22   example, 48 hours to confer with my client before we fully

23   come to rest on that question or at least be able to raise it

24   again and revisit it with the Court knowing that I have not

25   yet had a chance to confer with my client about the Court's

1    position.

2              THE COURT:  I'm fine with that.  I am not

3    scheduling anything else for this time.  I am willing to wait

4    and defer the decision on when and if we start.  So that's

5    not a problem.

6              MR. SHANNON:  Okay.

7              THE COURT:  In terms of the rest of the final

8    pretrial, it's not a traditional final pretrial because none

9    of us have ever done this before.  It is my intention to

10   hopefully be in my office while the evidence is being

11   presented.  We'll see if that's possible or it's not.  I may

12   be in and out of my office.  We will be very controlled by

13   technology issues and witness order and all that, we'll just

14   take it as if comes.  Because whether this is an

15   international relation issues or COVID issues, I'm sensitive

16   to the fact that technology is going to make many challenges

17   for all of us.

18              That being said, I am envisioning -- I guess I told

19   you last time, and I will stick by it, but I will be flexible

20   on the time, the hours that we're sitting.  Why don't you

21   guys tell me what you want to do, what you see the issues are

22   that we need to sort out before we start this trial.

23              MR. FRAZIER:  This is David Frazier.  I'm going to

24   hand it over to my partner, Mr. Morin, at this point.  I

25   think we have a way of changing the camera to him.

1          MR. MORIN:  I'm going to try, Your Honor.  Good

2     morning, Your Honor.  This is Mike Morin from Latham &

3     Watkins on behalf of the plaintiffs.  I haven't appeared

4     before you in the past.  Judge Burroughs, it's nice to be

5     here.  We appreciate your time.

6          There are three different issues that we'd like to

7     address on the plaintiff's side that we think are important

8     to sort out before we press forward towards trial.  Two of

9     them have to do with the procedures for the trial and were

10    the ones I intended to raise.

11         But we have an additional one that came up, Your

12    Honor, in Monday, in ImStem's pretrial brief.  And that is on

13    page 50 of that brief they make a brand-new argument that the

14    state law claims here, Your Honor, are preempted.  This

15    court, Massachusetts court, both Judge Saylor and Judge

16    Hillman of the First Circuit have all made it very clear that

17    preemption isn't an affirmative defense.

18         Preemption was never raised in this case for the

19    almost three years that the case has gone on.  The first time

20    the words appeared was on Monday.  It is not pled as an

21    affirmative defense.  The case started, like I said, three

22    years ago.  It wasn't in their initial pleadings.  It wasn't

23    in any of their pleadings.  And it showed up for the very

24    first time on Monday, five weeks before trial.  They have

25    several pages on why they contend -- they're wrong on the

1    merits, but the point is it's not in the case, and we'd just

2    ask for that to be obviously set aside.  It's an affirmative

3    defense that was never pled.

4           Like I said we had our law clerks search for the

5    word preemption, and it didn't appear in this case until

6    Monday.  So that's the first thing.  And then we can talk

7    about the sequencing and order of issues for trial.

8           I've met a number of the attorneys on the other

9    side.  Obviously I think we'll work together collectively on

10   trying to make this case go as smoothly as possible.  But

11   that's the one threshold issue I'd like to address before we

12   get to the issues on the presentation for trial.

13           MR. SHANNON:  May I be heard on that, Your Honor?

14           THE COURT:  Sure.

15           MR. SHANNON:  This issue was just raised --

16   Astellas's objection was raised by email a half hour before

17   this conference.  We considered and still consider the

18   preemption defense to be a legal defense.  It's not listed

19   among the affirmative defenses in Rule 8.  We think it is

20   arguably jurisdictional but, in any event, legal.  Very

21   interested to look at the case law that is cited.  If the

22   Court has previously determined that it's an affirmative

23   defense that needs to be pled, then we'll address that then.

24           I would flag again, this is just based on 30

25   minutes of consideration, but it's not clear to us exactly

1    why they contend or the Court would contend it's an

2    affirmative defense.  There's no real evidence to be gathered

3    with respect to it.  It's a purely legal question.  So I am

4    not sure it fits the sort of standard flavor of affirmative

5    defense.  I'm happy to look at the case law that they have

6    and address it upon seeing it.

7              But in the first instance, we think it's a legal

8    defense.  We put it in as a legal defense.  We could have

9    raised it in summary judgment.  We decided not to throw the

10   kitchen sink at you and led with the arguments we thought

11   were cleanest and easiest at that time.  They have not really

12   pushed facts in any direction that would lead us to believe

13   that branching isn't still a viable legal defense arguing as

14   they have in their trial brief that this is all just one ball

15   of the same facts.

16             If so, we think this is a preemption defense.  But

17   again, happy to look at whatever briefs and cases they send

18   to us.  My only request is if the Court entertains briefing,

19   which would be fine with us, we'd like to put a short page

20   limit on it.  There's been a lot of briefing in this case.

21   It seems to us this could be a five-pager, and we could turn

22   it around in a week.  With that scale of discussions, we

23   could put it before the Court properly.  I'm not sure that we

24   can or should hash it out now.  To the extent the Court wants

25   briefing, we'd request that it be targeted.

```
1          THE COURT:  I have no idea what this issue is, and
2     I haven't read the trial briefs yet.  I'm happy to have the
3     briefing done.  I guess you would start, Mr. Shannon.  You
4     can do five pages and they can respond with five pages.
5          MR. SHANNON:  Your Honor, perhaps it makes sense as
6     established as the aggrieved party to put in the brief first?
7     Did I miss that?
8          THE COURT:  It came up in -- you put it in your
9     pretrial brief that you were going to.  It should be their
10    brief first, right?
11         MR. SHANNON:  Exactly.  Just to throw a schedule
12    out there, if they want to give us five pages in a week, we
13    can respond three days later.
14         THE COURT:  That sounds fine.  All right with you,
15    Mr. Frazier?
16         MR. FRAZIER:  Yes, Your Honor.
17         THE COURT:  All right.  Next.
18         MR. MORIN:  Two other issues.  One has to do with
19    the presentation of and time for trial.  Your Honor, we
20    understand that you've set aside two weeks for trial.  We're
21    the plaintiffs.  We bear the burden of proof on most of the
22    issues.  We're fully prepared to get this done within two
23    weeks.  We have proposed that each side be allocated 20 total
24    hours to make sure that we can hit that two-week period of
25    time.  That would include openings, closings, direct, cross,
```

1    whatever the party wants to do.  We're not married to that.

2    But of course, Your Honor, we're trying to make things smooth

3    for the Court and make sure we get done within the two-week

4    period of time.

5            We were surprised when we got from the other side a

6    list of their witnesses and their time allocations.  That's

7    on page 17 of their trial brief.  On their side alone they

8    have proposed 44 and a half hours of live testimony plus two

9    hours of played video depositions.  So 46 and a half hours

10   plus openings and closings.  So I guess they want to use 50

11   hours on their side.  That would be 100 hours total if we get

12   equal time.

13           That would be a four- or six-week trial.  We're

14   concerned about that.  We'd like some guidance on that.

15   We're willing, like I said, as plaintiffs to live with the

16   time allocation to make sure we get things done within the

17   two week period of time.  But they have almost tripled really

18   what would be reasonable in a two week period of time

19   especially within the constraints of Zoom and doing things

20   remotely.  We'd like the Court's guidance on that.

21           Like I said, we'd be willing to live with whatever

22   time parameters you'd like us on us.  But especially given

23   the situation that giving each side a certain number of hours

24   may be the fair and equitable way to do it.  Of course we

25   defer to the Court.  What we do know is they have witnesses,

1    and we're also -- we're concerned that our friends on the

2    other side may try to exceed the scope of their expert

3    reports.  Because, for example, they have witnesses who have

4    25 total pages of substantive expert reports, yet they're

5    proposing five-hour directs, which again, doesn't make any

6    sense.  They should be done in an hour with that kind of

7    disclosure.

8            We are just seeking some guidance from the Court on

9    that and making sure that things are reasonable and equitable

10   for both sides.

11           MR. SHANNON:  May I?

12           THE COURT:  Go ahead.

13           MR. SHANNON:  I'm going to try my computer audio.

14   I feel guilty shouting into my headset.

15           THE COURT:  You're not shouting.  It sounds fine.

16           MR. SHANNON:  Can you hear me now?  Okay.  Great.

17   Your Honor, just a couple of points.  We put out this list of

18   witnesses so everybody would see who we're going to call, and

19   this is the intended order which we think gives the Court and

20   the other side guidance.  We think having something

21   resembling a schedule is helpful.

22           For the individual estimates, we erred high.  And

23   we dropped a footnote to that effect because we wanted to

24   include the uncertainties of Zoom.  And that will be

25   particularly at the beginning of the trial as we're all

1   working through exhibit handling, which I suspect is

2   Astellas' third point, and we're prepared to talk about that.

3   We actually have done a little more practicing with it.  With

4   just a little more practice, we've gone it down to be quite

5   smooth, and it will depend on how the Court wants to handle

6   it with the Clerk.

7         We've overestimated each of these witnesses to make

8   sure we have a buffer in all of those regards.  The other

9   reason we put in high estimates on each of these, Your Honor,

10   is because we weren't sure what the Court's practice was with

11   respect to estimating and number of hours per given witness

12   if the Court would then hold us to exactly that number of

13   hours for that witness even if that witness would turn out to

14   be richer or more important or more voluminous than expected.

15         We don't expect the overall trial to require the

16   number of hours that we put down.  We'd be happy to ratchet

17   back the estimate overall, to sort of ratchet all of them

18   down to reflect that.  I think we can get close to 20 hours.

19   I think 25 might be better, but we're certainly prepared to

20   move and to accommodate.  We don't want this trial to go on

21   for six weeks at all, and we don't think it needs to.

22         We want to make sure we had enough cushion built in

23   so if an individual witness turned out to be longer or

24   required more cross than expected, we weren't going to get

25   snapped with we estimated an hour, and in an hour and five

1    minutes we had to sit down.  There's a little bit of cushion,

2    maybe a fair amount of cushion, built in in that respect.

3    The individual estimates are high.  As a result the

4    collective is high, but we think we can bring it back down

5    to -- I put out 25 or 30.  I'm certainly willing to move on

6    that.

7              THE COURT:  Mr. Frazier is right that we can expect

8    to get in about 20 hours in a week.  And if you're talking

9    about two weeks, that's about 20 hours per.  I also am

10   sensitive to the technology issues and various other things

11   that might come up because of COVID and the international

12   aspects of this case and the fact that it's our first time

13   any of us are trying to do a bench trial any of this.

14             I'm willing to let you go over a little bit, but

15   this isn't going to be like a three- or four- or six-week

16   trial.  I just haven't allowed for that.  And I'm not going

17   to shut you off if you've estimated an hour for a witness and

18   it goes to an hour and 15 minutes or an hour and a half.  But

19   when it starts to be like two hours or four hours, you've got

20   to accommodate that by shortening up a different witness.

21             You have two weeks to try the case.  I'm willing to

22   try some longer days or maybe go a little bit over, but we're

23   really talking about two weeks.  If you want me to put 25

24   hours each side, if that gives you some guidance, I'm willing

25   to do that.  That's probably more than two weeks.  I'll let

1    you go over a little bit, but we're not going to turn it into

2    a six-week extravaganza.

3            MR. SHANNON:  If you give us 25 hours, we'll make

4    it happen.

5            THE COURT:  25 hours, Mr. Frazier?

6            MR. MORIN:  This is Mike Morin.  25 hours sounds

7    fine per side.  What we would propose to include with it is

8    openings and closings and examinations that anyone does with

9    witnesses, and I think that will help us get through

10   efficiently what I'm sure our friends on the other side are

11   used to for most trials that we have.  The other question I

12   have, which is really more for the Court, is I'm sure both

13   sides, and I know from their disclosures, would like to play

14   you, Your Honor, some of the video testimony kind of live to

15   make sure you have context.

16           I would think that would count against whatever

17   side is playing the video to make sure we pick and choose our

18   best stuff, Your Honor.  For the remainder of the deposition

19   testimony, how would the Court like to receive that?  In

20   other words, we might play, since it's a bench trial, 10

21   percent live of the video testimony that we have entered into

22   the record and to refer to in briefings and the like.

23           Would you like to just kind of accept as part of

24   the record the remainder of the designated deposition

25   testimony either in multimedia and/or in written form?  How

1    would the Court prefer to receive the testimony that we're

2    not playing live for Your Honor?

3              THE COURT:  What are my choices?

4              MR. MORIN:  What I would propose, and I think our

5    friends would probably agree with, is, like I said, the stuff

6    that we play in terms of video that we play be counted

7    against the hours, but that everything else that the parties

8    want to designate and put in, we could send you in written

9    form.  And we could also send you, if you're interested in

10   listening or watching live, sending you multimedia as well so

11   you'll have it at your disposal.  And then we'll agree that

12   the designated testimony would be part of the record.  But of

13   course I leave that to Your Honor and your preferred

14   practice.

15             THE COURT:  That all sounds fine.  I definitely

16   want the written.  If you want to send the multimedia along

17   with it, if there's someplace that we find we need to watch

18   for intonation, we can do that, but I am not going to watch

19   it all.  That's fine to make it part of the record, but like

20   a jury, I am not promising you I'm going to go back and read

21   all of that deposition transcript.  If there's something that

22   is cited in a brief or referred to in testimony, I will go

23   back and look at that if I think it's important, but I am

24   not -- I am not going to read it all just because I have it.

25             MR. MORIN:  We totally understand, Your Honor.  We

1    wouldn't expect you to.  I would think both sides on the

2    things we think are really important would cull it out in

3    expert testimony, by plaintiff video or by referring to it in

4    the briefs.  We're not trying to do a document dump on you,

5    but at the same time we want to make things efficient for you

6    and make sure we don't take too much of your time live by

7    trying to read everything into the record.

8              If that's good with Your Honor, it sounds like it's

9    okay with the other side, that's how we proceed there.

10             MR. SHANNON:  It's not entirely okay with the other

11   side, Your Honor.  May I?

12             THE COURT:  Yes.

13             MR. SHANNON:  We're mindful of a document dump, and

14   we're mindful of the fact that they've designated tons of

15   deposition testimony.  Dr. Xu, Dr. Men, Dr. Lu.  Having just

16   told the Court that this can all be done quickly and they

17   only need 20 hours, to then dump ten more hours of video

18   testimony on you strikes us as a little bit of a work around.

19             And we would instead suggest if there's any video

20   that they want played, it should be played in their time

21   which, of course, is your time as well.  I'm mindful of there

22   not being a back door.

23             THE COURT:  Mr. Shannon, they can have a back door,

24   but -- I don't care what you dump on me.  But I just made it

25   perfectly clear that if it is not played in front of my face,

1    you cannot count on the fact that I'm going to read it or

2    look at it or have any exposure to it.  Dump away, but

3    understand that the only thing you can be certain I'm going

4    to see and be certain I'm going to consider is what is

5    presented in front of me.

6              MR. SHANNON:  Okay.

7              THE COURT:  It's just like a jury.  You dump on

8    that stuff on them, they send it to the back room, and you

9    have no idea whether they open it or not.

10             MR. SHANNON:  Understood.  Thank you, Your Honor.

11   Astellas, you have one more issue, and then I've got a

12   couple.

13             MR. MORIN:  We did.  The last thing, Your Honor,

14   there are other disputes that the parties have, but I would

15   think you'd expect us to work out things like times of

16   exchanges and things.  We will do that with the other side.

17   But the other dispute has to do with the identification of

18   exhibits to be used with witnesses in direct examination,

19   Your Honor.  We have proposed that three days before a

20   witness takes the stand on direct that the exhibits, the

21   identity of the exhibits to be used with that direct witness,

22   be identified to the other party.

23             I haven't been involved in a case in ten years

24   where we haven't done that to try to give notice to the other

25   side of what exhibits are going to be used so we can work out

1    any evidentiary issues, without bothering Your Honor, between

2    ourselves, negotiate those out so that we hopefully don't

3    have to present them to you or hold up the examination of the

4    witnesses.

5            The other side doesn't want to do that.  They claim

6    that that would be too expensive for some reason, which I

7    don't really understand, because that's just providing a list

8    that says we intend to use Exhibits 87, 112, 180, whatever it

9    is, the list.  But it certainly is important for us to try to

10   work out any evidentiary things in advance.

11           The other side says that they don't intend to

12   actually hold on to their objections and make those

13   objections later on, but unless they're willing to drop them

14   all ahead of time, we don't know that for sure.  The other

15   thing is is that I mentioned a concern earlier, their experts

16   by and large, other than the patents in suit and the

17   pleadings in the case, hardly refer to any exhibits at all.

18   I have lists of them.  The main witness other than the

19   patents in the case cites to two other total documents.

20           If we have a list of ahead of time of what they're

21   planning to use with their experts, we can also try to

22   resolve whether they're trying to go outside, either side, I

23   should throw that in also, trying to go outside the scope of

24   their expert report.  So at the end of the day, all that we

25   ask is that on direct examination, obviously not cross, that

1    the parties identify ahead of time the exhibits they intend

2    to use in direct, and that will make your life easier because

3    we can address any disputes that we may have prior to the

4    examination of the witnesses.  Again I haven't seen a case

5    where we haven't done that since I can last recall.

6              MR. SHANNON:  Your Honor, our objection to this is

7    several fold.  We're perfectly fine with the idea of showing

8    them an exhibit list the night before.  That's fine.  We're

9    not trying to spring anything on anyone.  I think morning of

10   is common, but we're okay with night before.  What we're not

11   okay with, Your Honor, is the sort of baroque multi-layered

12   process that they laid out where three days before you give a

13   list; two days before there's objections; day before there's

14   a meet and confer and those are constantly layering on top of

15   each other.

16             So just to illustrate the effect, by the time we

17   take our first witness on the first day of our case-in-chief,

18   assuming we have just one witness per day, A-B-C-D on days

19   one, two, three, four, very simplest case possible, we would

20   be presenting A, serving exhibits for D, receiving objections

21   for C, and having a meet and confer on B.  The opportunity

22   for error and mistake is enormous.  We think a --

23             THE COURT:  Stop.  Exhibits two days before.  We'll

24   hash out objections on the record if we have to.

25             MR. MORIN:  Perfect, Your Honor.

1          MR. SHANNON:  Your Honor, we've got a few on our
2    side that we'd like to raise if we may.
3          THE COURT:  Go ahead.
4          MR. SHANNON:  Relatedly, Astellas in their pretrial
5    proposed that the parties mail boxes of cross examination
6    documents to witnesses two days in advance, to be received
7    two days in advance.
8          MR. MORIN:  I'm holding up my hand because we'll do
9    the electronic thing.  I should have worked that out with you
10   before taking the judge's time.  We can use electronic
11   documents for cross examination.  That's fine.
12         MR. SHANNON:  Great.  Thank you.  If you have no
13   objection, Your Honor, I'd like to turn to the next issue.
14         THE COURT:  Go.
15         MR. SHANNON:  Exhibits in general.  Now, it's
16   particularly true for cross, but we just want to flag the
17   issue of presentation of exhibits in general.  There are two
18   ways we think we can do it.  Let me just lay them out and
19   maybe give the pros and cons of each because we think there
20   are pros and cons of each.
21         One is to push, for the examining attorney to push
22   the exhibit into the chat room and then everyone receives it
23   at the same time.  The witness downloads it, looks at it,
24   talks to it.  And there's a very nice feature here in Zoom if
25   you minimize your Zoom window, if you just click the little

1    flat bar in the upper right-hand corner, it all collapses

2    down to just one window of the person speaking, and that can

3    be superimposed on the document that the witness has right

4    there resident on the desktop.

5           We've done these with most of these.  We've done

6    these with exemplar exhibits.  I'm happy to do it right now

7    if the Court wants to see how it works.  The basic idea is

8    the examining attorney pushes it into the chat room,

9    publishes to everyone at the same time.  And then witness

10   pulls down his or her own copy.  That's one option.  That's

11   one general mechanism.

12          The other general mechanism, Your Honor, is to

13   simply share screens.  That is, if I'm the examining

14   attorney, I'd have the exhibit resident on my computer, and

15   I'd share my screen with everyone else.  And the Clerk of

16   course will be hosting so she can control the sharing.

17          THE COURT:  Are you asking for my preference on

18   this, or are you trying to make me make a decision so

19   everybody is doing the same thing?

20          MR. SHANNON:  Both.

21          THE COURT:  I don't care.  And as far as I'm

22   concerned, you don't have to do the same thing.  I'm happy to

23   just take it as it comes.

24          MR. SHANNON:  Okay.  That's useful guidance.  We

25   can work with that.  We can work with that.  There is the

1    small mechanical question that I do have to trouble you with,

2    Your Honor, and that is if we exchange exhibits beforehand

3    and we have resolved objections but there are still a couple

4    of lingering objections, I think what may make sense is for

5    us to publish it to you or just the Clerk, have you rule on

6    it and then revert to the normal process --

7         If I may just back up.  I think most exhibits will

8    go in without objections.  Astellas objected to literally

9    two-thirds of all the exhibits.  We objected to a third.  I

10   suspect at trial those numbers are going to go way way way

11   down.  I'm not waiving anything now, but I fully expect them

12   all to go down.  And in that case, the ordinary course is the

13   sort of publishing that I just described.

14        If there are some where there's an objection, we

15   just need to publish it to the Clerk and have you look at it,

16   talk about it, without having the witness see it.  And I just

17   wanted to flag that step and see if the Court had any strong

18   feelings one way or the other.

19        THE COURT:  I don't.  You can even email me the

20   documents.  We can manage this.

21        MR. MORIN:  Your Honor, with Your Honor's blessing,

22   of course, you're going to run your court how you'd like, to

23   state the obvious, but with Your Honor's blessing we always

24   felt if there are lingering objections, which we hope they're

25   not, to hopefully address them with you before the witness

1    takes the stand.  They're going to be given the list two days

2    before the witness, so hopefully I imagine before the witness

3    takes the stand, again we defer to Your Honor, but we might

4    address any issues before we resume, and we'd try to work out

5    the things so we're not interrupting the witness just before

6    the witness takes the stand.  I think we can all work all

7    that out at trial.

8            THE COURT:  That's fine.  I'm happy to take 15

9    minutes at the beginning of each day and go through exhibits.

10           MR. SHANNON:  Okay.  Great.  Your Honor, just a

11   couple more issues in this same vein.  We'd ask that the

12   demonstratives, we'd like to publish those the day before

13   rather than two days before.

14           MR. MORIN:  That's fine.

15           MR. SHANNON:  Great.  Those are dynamic.  And then

16   finally, Your Honor, time zone accommodation.  Our experts

17   are two time zones away.  And Dr. Men and Dr. Xu, who again

18   we don't think will be available but might be, are 12 time

19   zones away.  So without pinning exact times now, we propose

20   in general late morning start for our experts, if possible,

21   and a very very early morning start for Dr. Xu and Dr. Men,

22   if they're able to get to Hong Kong to testify.

23           THE COURT:  Let's take it as it comes, but I'm

24   willing to do that.  Is that it?  Do we need to meet again

25   before trial?  Do you guys want to have one more?  Or do you

1    want to say we'll start at whatever, we'll pick a time on the

2    first morning of trial and go?

3                MR. FRAZIER:  Why don't we say we can go on the

4    morning of trial, that the parties will notify the Court.  We

5    think that there are issues that need to be hashed out in one

6    more conference.  We have one issue maybe along those lines,

7    is that we have some technical things that we need to run by

8    the Court's IT staff and just wanted some guidance about who

9    we should be trying to communicate with there to make sure

10   we're up and running and ready to go.

11               THE COURT:  Karen, will you let them know who they

12   should be talking to.

13               THE CLERK:  Yes.  They can email me.

14               THE COURT:  Karen, what's the first date of trial

15   we decided on?  Is it the 14th?

16               THE CLERK:  I think it was the 14th.

17               THE COURT:  Because the public schools are so

18   discombobulated right now, the 14th may be my kids' first day

19   of school.  I would like to go for a 10:00 start that day so

20   I can get them off, seeing as it's their first day.

21               MR. SHANNON:  Great.  Your Honor, can I flag two

22   small issues as well?  First, as we flagged back in June, one

23   of our experts, our damages expert Green is on trial in Texas

24   for a portion of the time, and I'll defer to Ben if he wants

25   to chime in.  He knows Bill's schedule better than I do.  As

1    we flagged the time he's got trial scheduled, in fact he has

2    a couple.  A couple of those moved around.  That's still very

3    much in flux.  There's a chance he might have to fall outside

4    the two-week period.  We're hoping very much that he doesn't

5    have to.  We'd ask everyone including Astellas to be flexible

6    to possibly take him out of order if we needed.

7              MR. MORIN:  Your Honor, I can see taking him out of

8    order within the two weeks.  A, the Texas courts have been --

9    they just postponed the Big Apple case.  I suspect it may not

10   be an issue by the time we get there.  But B, I suspect even

11   if we take him out of order, meaning not in the order he was

12   identified in, we should be able to do him sometime within

13   those two weeks.

14             He's clearly not testifying for two weeks straight

15   in Texas, and he can do it remotely.  I think we can take

16   this up as it goes to trial.  We may object to it being

17   outside the trial period.  We may not object to them doing it

18   out of the normal sequence or even during our case-in-chief

19   if that's all that we can accommodate.  I think we'd probably

20   be okay with that.

21             It's a bench trial rather than the jury trial.

22   We're confident in the Court's ability to compartmentalize

23   things.

24             THE COURT:  We'll take it as it comes.  I'm happy

25   to take him out of order.  I'm happy to break up his

1   testimony if that's what we need to do.  I'm happy to, if
2   this trial goes a little bit over two weeks, take him at the
3   end.  But again I'm not going to hold the evidence open for
4   big chunks of time to accommodate experts.  I doubt that the
5   trials in Texas are going forward, and I doubt that he's
6   going to need to testify for two weeks.  I'm with Mr. Morin,
7   and I'm confident we can sort it out as we go.
8            MR. SHANNON:  Your Honor, I don't want to overstate
9   the concern.  I just want to flag it.
10            THE COURT:  Got it.
11            MR. SHANNON:  Finally, Your Honor, it's a bench
12   trial.  There is a lot of paper.  It's unclear to us, do you
13   want five minutes of primmer?  Do you want an hour long
14   stem-winder?
15            THE COURT:  Up to you.  You have 25 hours.  Do what
16   you want.
17            MR. SHANNON:  Okay.
18            MR. MORIN:  And, Your Honor, along those lines just
19   very briefly, we noticed in Your Honor's preferences you talk
20   about how you generally are not a big fan of chalks in the
21   openings, but if the parties agree to them, we can use them.
22   It strikes me especially in a Zoom trial and a trial with
23   some technology that the PowerPoints from both sides may be
24   useful to you.  I want to make sure that's okay with you so
25   we don't disappoint when we start the trial.  It would seem

1    like in this case they might be useful.

2          THE COURT:  That's fine.  On a bench trial that's

3    fine.  I don't like running the risk that something shows up

4    in a chalk and it ends up not coming into evidence in front

5    of a jury.  If it ends up not being appropriate for me to

6    consider, I'll compartmentalize and disregard it.  I'm fine

7    with chalks.  Anything else?

8          MR. MORIN:  We want to thank the Court for your

9    time today and opposing counsel on the other side also.  This

10   is going to be a new one for all of us.

11         THE COURT:  We will be flexible and kind to each

12   other as we go as long as it sort of stays within the bounds

13   of reasonable of something so new.

14         MR. SHANNON:  Your Honor, have you determined, and

15   if you did, I missed it, what the typical trial day will be?

16   I know we're starting at 10:00 on the first day.  Are you

17   imagining three-hour days, five-hour days, six-hour days?

18   Don't know?

19         THE COURT:  I don't know.  And I'm willing to vary

20   it up by the day.  We can talk about it as we go.  On that

21   first day we'll start at 10, probably go to 12, take a half

22   hour break for lunch if that works for people.  We can take a

23   longer break if you want.  That's two hours.  Do you guys

24   want a half hour break or hour break for lunch?

25         MR. MORIN:  Half hour.

1          MR. FRAZIER:  A half hour is fine, Your Honor.

2          THE COURT:  Let's say we go from 10 to 12.  We take

3     a break from 12 to 12:30.  We go from 12:30 to 2:30.  Then

4     let's see where we are.  If we're in the middle of a witness,

5     and it's going to be another hour and my kids are not in

6     school, I'm happy to keep going.  If I have to go get them, I

7     have to get them.  Let's play it by ear.  Figure at least 10

8     to 2:30.

9          MR. MORIN:  Your Honor, if I could bother you on

10    this.  I know everyone on our side would be happier to do

11    longer days to get the trial done in time.  We're happier to

12    do longer days.  I take it from your comment earlier it's

13    possible we may run a day or two beyond the two weeks but not

14    beyond that.

15          I'd just ask for scheduling purposes for not only

16    attorneys, we're secondary, but clients and witnesses, we

17    won't go longer than a couple days past two weeks at the

18    most.  Is that fair?

19          THE COURT:  I don't have a trial scheduled the week

20    after.  I am uncertain about how much technology is going to

21    delay us.  So I'm thinking about something like the 50 hours,

22    and if there are things that push that off, it's fine.  In

23    all candor, some of those things that push us off might be

24    me.  I have no idea what my kids' schedules are going to be.

25    It's hard for me to predict what those weeks are going to

1   look like at this exact moment.  I am also happier to go

2   longer days.  For example, if we're coming to an end of a

3   witness, if it looks like we can finish a witness if we go

4   another hour and hour and a half, that's what I'm going to

5   do.  I just don't know what my life is going to look like in

6   mid September.  I'm going to hold off on making a firm

7   schedule, but I am amenable for longer days.

8            MR. MORIN:  It's 2020.  I don't think any of us

9   knows, Your Honor.

10           THE COURT:  My nanny just had a baby.  I have a lot

11  on my table.  The Massachusetts Domestic Workers Rule has

12  excluded me from finding a new nanny.  I'm sort of flying

13  blind here.  My kids are in public school.  I don't know if

14  they're going to be remote.  I don't know if they're going to

15  school two days a week.  I'm having a hard time firming up my

16  schedule.

17           My normal trial day is 10 to 4.  I don't know if I

18  have the stamina on a bench trial on a patent case with only

19  a half hour for lunch to go 10 to 4 every day, but I can go

20  10 to 4 a lot of days, but I'm reluctant to commit to that.

21  One way or another that week is the first week of the kids'

22  school, and I need to be a little flexible to figure out what

23  we're doing.

24           MR. MORIN:  We'll make it stimulating and

25  interesting.  You'll just hate turning off the computer every

1     day.

2            THE COURT:  Famous last words.  If you need

3     anything, talk to Karen.  She knows how to get ahold of me.

4     Otherwise we'll see you on the 14th.  Thanks, everyone.

5            (Court recessed at 11:21 a.m.)

1                    - - - - - - - - - - -

2                      CERTIFICATION

3

4          I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Joan M. Daly                September 19, 2020

11

12    _____            _____

13    Joan M. Daly, RMR, CRR          Date
      Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25